NEW YORK, N. H. & H. R. CO. v. DE NOYELLES.

(Circuit Court of Appeals, Second Circuit. March 26, 1907.)

No. 706.

1. COLLISION—PERSONAL INJURIES—CONTRIBUTORY NEGLIGENCE.

In an action for injuries to plaintiff by a collision between defendant tug and one of several floats attached to a dock, whether plaintiff was negligent *held* for the jury.

2. SAME—NEGLIGENCE.

Defendant tug while going up a river to defendant's coal dock, which was located just below the dock to which plaintiff's boat was moored, collided with the outer of several floats attached to such dock, and the shock being communicated to each plaintiff was caught and injured as he was standing on a stringer in front of the bulkhead of the dock. The maneuver executed by the tug at the time of the collision was the usual one apart from the degree of violence of the contact, and it also appeared that the master of the tug, by reason of intervening cars on one of the floats, and plaintiff's stooping posture, could not have seen him, and did not know of his dangerous position. *Held*, that the master of the transfer was not negligent in adopting the maneuver executed at the time of the collision, nor in failing to discover plaintiff's presence either just prior to the collision or as the tug was approaching the dock at a time when plaintiff was in a place of safety.

3. SAME—NEGLIGENCE—QUESTION FOR JURY.

In an action for injuries to plaintiff in a collision between defendant's tug and a series of floats attached to a dock, whether the master was negligent in causing his tug to come in violent contact with one of the floats without knowing that persons were not working in or around them, *held* for the jury.

In Error to the Circuit Court of the United States for the Northern District of New York.

Writ of error by defendant below to review judgment of the United States Circuit Court for the Northern District of New York, entered upon a verdict in favor of plaintiff below, for $20,134.26 for personal injuries. The undisputed facts material to the issues presented herein are as follows: The defendant is the owner of a dock known as the "fish dock," on the east side of the Harlem river, above the Willis Avenue Bridge. The river at this point is about 400 feet wide. At said dock there is a bulkhead with piles for mooring vessels. Outside of the bulkhead there are spring fender piles bowed and keyed into stringers stretched along the outer edge of the bulkhead. There are three rows of these stringers eight or ten inches wide, and so located the one above the other that a person may step down on them from the bulkhead. The plaintiff was captain of a barge, and on the night before the accident had brought her to said bulkhead at the fish dock and had discharged his cargo. During the night a scow loaded with ashes, a car float loaded with cars, one of defendant's tugs, and another float loaded with cars, all belonging to defendant, had come up alongside of plaintiff's barge in the order stated, and lay there lashed together and to each other in the usual way. In the morning, while the plaintiff was waiting for a tug boat to take him away, he discovered that the breast line on the starboard bow of his barge had slipped down on the

spile, and the knot was jammed in between the spile and the barge so that he could not haul it out. He called on his deck hand to assist him and to pry out the barge from the spile, and stepped down on the lower one of the three stringers, and while standing, either with one foot on the rail of the boat and one on the stringer, or with both feet on the stringer, and stooping over to reach for and pull up the line, he was thrown down between the bulkhead and the barge by the shock of the barge striking the bulkhead, and caught on a stub on the dock, and while in this position was again struck and crushed and seriously injured. The conditions leading up to and causing this damage were as follows: Just prior to the accident, the defendant's tug, Transfer No. 4, 92 feet long, was coming up the river, bound for the defendant's coal and water dock located just below the fish dock. The tide was setting up the river. The boats at the fish dock projected out over 100 feet, and on the opposite side of the river lay a schooner and hoister projecting out about 35 feet. In order to round to against the tide, so as to enter the coal and water dock, the master of the Transfer No. 4 stopped his boat after he cleared the Willis Avenue Bridge, ported her helm, then backed and filled so as to let her stern swing up with the tide, went ahead so as to bring her bow against the side of the outside float, and then, while her stern was swinging up river with the tide, he worked along the edge of the float toward the coal and water dock. The impact caused by the striking of this Transfer No. 4 against said float, and communicated through the intervening boats to plaintiff's boat and the dock, caused the plaintiff to fall and receive the injuries complained of.

H. G. Ward and William Greenough, for plaintiff in error.

R. J. Donavan and Herbert D. Cohen, for defendant in error.

Before LACOMBE, TOWNSEND, and COXE, Circuit Judges.

TOWNSEND, Circuit Judge. The single assignment of error challenges the action of the trial judge in refusing to direct a verdict for the defendant on the ground either that the defendant was not in fault, or, even if in fault, that plaintiff's fault contributed to cause the injury.

The contention of contributory negligence need not be discussed. The plaintiff, it is true, when he saw the approaching boat 100 feet away, was in a place of safety, and he put himself in a perilous position where apparently he would be likely to be injured by a very slight jar or disturbance of the water. But this question was one peculiarly for the jury, the burden of proof was upon the defendant, the facts were fairly submitted to them in a charge to which no exception was taken, and their verdict is conclusive upon this point.

A more serious question is presented upon the contention that no negligence has been shown on the part of the defendant. The maneuver executed by the master of Transfer No. 4 appears to have been a usual one in such conditions when it is necessary, and, barring the question of the violence of the jar in contacting with the float, seems to have been properly performed. There is considerable testimony to the effect that that was the only practicable way in which to reach the coal dock with this boat in a flood tide and with the accumulation of boats at this point.

Furthermore, we find no negligence in the fact that the master of the transfer did not see the plaintiff at the time of the collision. The evidence shows that he was in a position where he could not be seen from the transfer. The plaintiff himself testifies as follows:

"I could not look over the cars. She went past the cars. I could not see it, as the cars were between me and the transfer, until after she went by them.

From the place where I stood, I could not see the boat. The Transfer I saw coming up the river, after she passed the line of freight cars on that float. Then I could see her after that. I could not see it when it was behind that line of cars; but after she passed I could."

And it appears further from his testimony that at the time of the accident he was stooping over so far, in order to get at the line, that probably his body was out of sight.

Nor do we find any negligence on the part of the master of the Transfer by reason of the claim that he could have seen plaintiff when the Transfer was coming up the river, for the plaintiff at that time was in a place of safety. As he says:

"I was standing on the string piece. I hadn't stepped down between the boat. I was standing on the string piece when I got hit. When I looked down the river and saw the Transfer, I was on the bow of my boat; on the deck. We were just starting to get the rope up with the pike pole. We had tried it with a pike pole, and were just going to try the other way. At that time the Transfer was headed right up the river, and was, I should judge, about the length of 100 feet from me. * * * She was, I should judge, about 100 feet—not from me, but from the railroad float. She was further out in the river towards the railroad float. She was not opposite the railroad float. The tug was below the railroad float. She was coming up towards the railroad float, outside. She was about 100 feet below the railroad float."

Nor do we find any negligence in the failure of the master of the transfer to give any signal by means of whistles or bells. There are no rules of navigation which provide how warning of such a maneuver shall be given.

It is further immaterial whether upon the whole case we would have been disposed to hold that the master of the Transfer was guilty of negligence, or that the impact of the blow upon the outside float was not of such force as to raise a presumption of negligence. It may well be that the disturbance caused by such impact was no greater than the displacement which would have resulted from the waves and swell caused by such a tug in passing along up the river without stopping, or in maneuvering to enter the coal and water dock without coming in contact with any other boat. The sole question presented to us upon this record is whether there was any such evidence of negligence to go to the jury as would be sufficient to justify them in finding that the agents of defendant were negligent.

It appears from the record that defendant's agents knew that there were people living and working on and about these boats, and that, if a moving boat came in violent contact with them, it might cause injury to such persons. And, while there is considerable testimony to the effect that this blow was so slight that it could not have been communicated through the whole flotilla of boats to the place where the plaintiff was standing with such violence as to throw him down in the manner described, yet we are not at liberty to ignore the testimony of the plaintiff and mate on this point. The plaintiff testified that the first crash knocked his feet from under him. His condition sufficiently indicates the violence of the second shock.

The testimony of the mate on this point was as follows:

"I was standing on my feet. I was helping the captain. I did not have hold of anything when I fell down. I felt a jar. It affected me as if I was going down. I went. It threw me. It felt like a hard shock. It pitched me for-

ward about two and a half feet. I was on the deck of the boat. I was half of me off the boat—some on the boat and some over. I had to catch onto something. I catched onto the dock. That prevented me from falling. I heard the crash. I could not say where that was. * * * This noise which I heard was towards the river. As I was pitched forward, I fell on my hands. The deck, in reference to the dock, was pretty much near level. I lay there flat. I answered the court that I caught on the dock, or I would have fallen. But I fell. But I would have fallen into the river if it had not been for the dock."

It appears, furthermore, from the testimony of the witnesses for defendant that it is the duty of such boats, when about to execute such a maneuver, to have lookouts to notify the master if there are people working in and around the boats, and that, if the lookouts on this occasion had seen any one on the boats, they would have notified the captain, and "in that case he certainly would not have run up against them." And the experienced master of one of defendant's transfers, which was lying at the dock at the time of the collision, testified in regard to the custom in the execution of such a maneuver as follows:

"As a matter of precaution, as a matter of safety to the boats I am coming up against, I have to bring my boat in touch with the adjoining boats in such manner as not to throw any one down, or break anything."

It appears, further, that the gross tonnage of the Transfer was 102 tons.

In these circumstances, the question of defendant's negligence was submitted to the jury by the court upon an exhaustive consideration of the evidence and a fair and correct statement of the law applicable thereto, and to which no exception is urged.

We are, therefore, concluded by the verdict of the jury, and the judgment thereon must be affirmed.

NOTE.—The following is the opinion of Ray, District Judge, on motion to set aside a verdict:

RAY, District Judge. No point or question is raised that there was any error in the admission or rejection of evidence or in the charge to the jury. Under all the evidence in the case a fair question of negligence and of freedom from contributory negligence was presented for the determination of the jury. The plaintiff was very severely crushed and injured from his shoulders to his feet inclusive, and these injuries are permanent, and plaintiff will never be any better or free from pain. In all human probability he will grow worse. He will never be able to dress and undress himself, or do any labor except light work with his hands. Considering his age and his earning power both before and since the accident, and the nature and permanence of his injuries, the damages awarded were not excessive; indeed, they were moderate. There was an abundance of evidence to sustain a finding of negligence on the part of the captain of the defendant's tug that ran against the floats and jammed them against the canal boat of the plaintiff where he was at work with his mate in plain sight of the captain of the tug that did the damage going up the Harlem river. If the captain did not see them, he ought to have seen them. He had an abundance of sea room in which to maneuver and turn his tug, and evidently could have run into the water and coal dock without coming in collision with the floats had he regarded it of moment or importance so to do. His evidence disclosed that he was ignorant, self-opinionated, cold-blooded, and reckless. He ran into the line of boats moored to this wharf, the canal boat next it, then the scow, and then defendant's heavily loaded floats with another tug between, recklessly and with great and unnecessary force in any event and with an utter disregard of the safety of those on and about those vessels. The evidence of Samuel Sprague, a witness for defendant, shows

the captain of the tug in question did what he ought not to have done. The evidence tended to show the collision was exceedingly severe and then persisted in. The evidence of John Johnson, a witness for defendant, and who was on the tug, shows it was the duty of those thereon to keep a lookout for people on or about boats tied to the wharf and those tied thereto outside, and, if any one was there, not to come in collision. Still the captain of the tug said, in substance, the only purpose of a watch or lookout was to enable them to testify how the injury was done in case of a collision and resulting damage and not to enable him or make it his duty not to come in collision with vessels tied to a dock. The captain of this tug testified as to the purpose of the watch on the tug for persons on vessels tied to a dock:

"Q. What did you keep a lookout for? What was the reason for your keeping a lookout? A. It is the rule that we should carry a lookout; that is all the reason I can give you. In case of accident in case of collision, that a man should be there on the bow of the boat to see just what is met with; that is the only reason I can give you for a lookout. Q. Let me see if I understand you. The reason for your keeping a lookout was in case you injured somebody, that you might be able to tell about it? A. Yes, sir. Q. So you might be a witness? A. That is what they are stationed out there for. Q. They are not stationed there for the purpose of warning men of your approach or preventing a collision? A. No, sir. Q. They are simply put there for the purpose in case you do run a man down, and he is drowned, you may be able to testify you saw him go down? A. Yes, sir. Q. That he went down? A. Yes, sir. Q. How you came to put him down? A. Yes, sir."

This was contrary to the credible evidence in the case. The captain of this tug gave no warning of his approach or that he was intending or expected to strike this fleet of boats—plaintiff's canal boat innermost and next the dock. The plaintiff was not down between the dock and boat, but standing with his whole body from the hips up in plain view of those on the tug. The collision threw the canal boat against him, and caused him to fall down between the boat and dock, and a second surge of the boat caused by another blow of the tug crushed him. Before getting in this position he looked up and down and saw this tug going up the Harlem river in midstream and nothing to indicate it would or was intending to come in collision. He had no reason to apprehend this tug would go up, turn, and then butt head on into this line of boats. The jury was amply justified in finding absence of contributory negligence, which, indeed, was not pleaded until during the trial by amendment there allowed. All these questions were for the jury. The case was not tried or submitted on any theory that there was any presumption of negligence on the part of defendant arising from the fact of the collision and injury.

The verdict was fully justified, and the motion for a new trial is denied.